## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| WEBCO INDUSTRIES, INC. )<br> )<br>    **Plaintiff,** )<br> )<br>v. )<br> )<br>RICHARDS KELLY DIAMOND, and )<br>ACCURATE NDT SERVICES, INC., )<br> )<br>    **Defendants.** ) | Case No. 11-CV-774-JHP-FHM |

### OPINION AND ORDER

Before the Court are Plaintiff Webco, Inc.'s ("Webco") Opposed Motion to Voluntarily Dismiss Counts VII and VIII [Doc. No. 44]; Webco's Opposed Motion to Voluntarily Dismiss Counts II and III [Doc. No. 86]; Webco's Motion for Partial Summary Judgment [Doc. No. 57]; and Defendants' Motion for Summary Judgment [Doc. No. 56]; Defendants' First Motion in Limine [Doc. No. 68]; Defendants' Second Motion in Limine [Doc. No. 69]; Defendants' Third Motion in Limine [Doc. No. 70]; Defendants' Fourth Motion in Limine [Doc. No. 71]; Webco's Motion in Limine [Doc. No. 74]; Defendants' Motion to Compel [Doc. No. 112]; Defendants' Objection to Deposition Designations of the Deposition of David Culbertson [Doc. No. 119]; Defendants' Objection to Deposition Designations of the Deposition of George Holliday [Doc. No. 120]; Defendants' Objection to Deposition Designations of the Deposition of Richards Kelly Diamond [Doc. No. 121]; Defendants' Objection to Deposition Designations of the Deposition of Robert Bonin [Doc. No. 122]; Defendants' Objection to Deposition Designations of the Deposition of Thomas Pitts [Doc. No. 123]; and Defendants' Objection to Deposition Designations of the Deposition of Rick Taylor [Doc. No. 124].

After consideration of the briefs and for the reasons detailed below, Defendants' Motion for Summary Judgment [Doc. No. 56] is **GRANTED** and Webco's Motion for Partial Summary Judgment [Doc. No. 57] is **DENIED**. In addition, Webco's Opposed Motion to Voluntarily Dismiss Counts VII and VIII [Doc. No. 44] is **GRANTED** without prejudice, and Webco's Opposed Motion to Voluntarily Dismiss Counts II and III [Doc. No. 86] is conditionally **GRANTED** with prejudice.

All remaining motions will be **DENIED** as **MOOT** if Webco does not withdraw its Opposed Motion to Voluntarily Dismiss Counts II and III [Doc. No. 86].

## BACKGROUND

### A. Undisputed Factual Background

Plaintiff Richards Kelly Diamond ("Diamond") is an expert in non-destructive testing ("NDT") of stainless steel tubing. Diamond began developing his expertise through training he received as a member of the United States Navy. Both during and after his tenure with the United States Navy, Diamond received a number of certifications concerning or related to NDT, and has completed around 2800 hours of training on to further his expertise. Since leaving the United States Navy, Diamond has used his NTD skills in various capacities to assist in NDT. In 2002, Diamond went to work for RathGibson, Inc., a specialty tube manufacturer, where he assisted in developing processes for the manufacture and NDT of stainless steel tubing. In 2009, Diamond left RathGibson, Inc. to start Accurate NDT Services, Inc. ("Accurate"), a corporation organized by Diamond in 2009 through which he provides NTD consulting services.

In 2009, Webco, a specialty tube manufacturer headquartered in Sand Springs, Oklahoma, sought Diamond's consulting services in order to develop a new line of stainless steel tubing made from a super duplex material. Webco was referred to Diamond by one of its

customers based on his experience in NDT, who believed Diamonds expertise would be necessary to develop Webco's new line of stainless steel tubing. On October 10, 2009, Webco and Diamond, who was acting on behalf of Accurate, entered into the "Webco Industries and Accurate NDT Services Agreement" ("Services Agreement"). The Services Agreement was for a one-year term commencing on October 15, 2009, with the option to extend for an additional year. Pursuant to the Services Agreement, Webco paid Accurate a $25,000 fee at the time the Services Agreement commenced, and an agreed upon hourly rate for services performed pursuant to the contract thereafter.

> The Services Agreement included the following relevant provisions:
>
> 2. During Agreement Term, [Accurate] will assist Webco in the development of welded seam super duplex umbilical tubing. The scope of this involvement is mainly in the area of nondestructive testing – ultrasonic, eddy current and radiographical inspection, however it may cover other areas of the manufacturing process and/or equipments as directed or needed ('Technical Development Services' or 'Services').
>
> 4. During Agreement Term, [Accurate] will not provide Technical Development Services to other seam welded umbilical tube makers, including 19D umbilical tube products.

[Doc. No. 57, Ex. 1 at 2]. The Services Agreement also included a "Nondisclosure & Non-Use Agreement" ("NDNU"). [*Id.* at 4]. The NDNU provided that Accurate would not disclose or use confidential information for any purpose not necessary to the performance of the Services Agreement. [*Id.* at 5]. The NDNU defined confidential information as follows:

> 'Confidential Information' means...any oral or written information,...equipment and manufacturing processes, technical data or know-how, patentable and unpatentable, registered and unregistered, including, but not limited to, trademarks, tradenames, licenses, research, product plans, products, services, customer lists,...developments, inventions, processes, designs, drawings,...or other trade secrets of the Disclosing Party, or similar items relating to the Disclosing Party's business activities.... 'Confidential Information' does not include information, technical data or know-how which (i) is in the possession of the Receiving Party at the time of disclosure as shown by the files and records of the Receiving Party immediately prior to the time of disclosure; or (ii) prior to or after

> the time of disclosure was or becomes party of the public knowledge or literature (other than as a result of any inaction or action of the Receiving Party in violation of this Agreement)....

[*Id.*]  Accurate's obligations under the NDNU survived the termination of the Services Agreement.  [*Id.* at 5].  The NDNU also provided that Webco "shall be entitled to equitable relief, including injunction, in the event of [an actual or threatened breach by Accurate]...."  [*Id.*] Further, Section Eight of the services agreement required Accurate to "comply with Webco's policies concerning [its] conduct while at the Webco facilities or the facilities of its customers." [*Id.* at 3].  Webco's "Non-solicitation and Distribution of Literature Policy" ("Non-Solicitation Policy") provided the following:

> Solicitation, distribution or literature or other non-work related items of any kind by employees during working time of the employee doing the soliciting or distribution, or distribution of literature of any kind or solicitation during the working time of the employee being solicited or receiving the literature is prohibited.

[Doc. No. 79, Ex. 3].

After the Services Agreement was executed, Accurate began assisting Webco in developing its new line of stainless steel tubing.  Webco and Accurate renewed the Services Agreement for an additional year concluding on October 15, 2011.  From the start of the Services agreement until May of 2011, Accurate presented Webco with periodic invoices, and Webco tendered payment to Accurate for the services it received.  After May of 2011, however, Webco received and approved Accurate's invoices, but never tendered payment to Accurate.  Accurate continued to provide services to Webco upon request until August of 2011.  On September 11, 2011, Accurate notified Webco that invoices totally $24, 831.20 were overdue and demanded payment of the outstanding balance to no avail.

While the Services Agreement was still in effect, Diamond and a business acquaintance, Ralph Gordon, made plans to start a tube manufacturing company and incorporated Coastal

Specialty Tubes, Inc. ("Coastal") in Florida. Diamond was named as Coastal's President, and participated in developing Coastal's business plan, including evaluating potential sites for a manufacturing facility and e-mailing a potential customer, which was also one of Webco's customers, regarding Coastal's plans. Webco learned of Coastal's existence sometime in July of 2011, and, subsequently, began an investigation into the matter. As a part of this investigation, Webco interviewed Kranthi Pallegar. Pallegar told Webco's management that he had discussed Coastal with Diamond and spoke with other employees about Coastal. Another Webco employee, Robert Epperly, the director of maintenance and engineering, told Pallegar that he wanted to speak with Diamond about Webco. After Pallegar relayed Epperly's request to Diamond, Diamond contacted Epperly at his residence and discussed the details of Coastal at length. Epperly provided Webco with notes he took during this conversation. Webco subsequently fired Pallegar and two other employees because Webco believed these employees had a conflict of interest arising from their relationships with Diamond and Coastal.

On August 29, 2011, Webco commenced the instant action against Defendants. Subsequently, in October of 2011, Coastal was dissolved without ever having the ability to manufacture any products.

## DISCUSSION

### A. Voluntary Dismissal Pursuant to Rule 41

On September 28, 2012, Webco filed an Opposed Motion for Order of Voluntary Dismissal for Counts VII and VIII. [Doc. No. 44]. On November 6, 2012, Webco filed a second Opposed Motion for Order of Voluntary Dismissal for Counts II and III. [Doc. No. 86]. In both motions, Webco explains that it "admits no invalidity or infirmity as to the causes of action

alleged and seeks only to streamline the litigation and reduce costs and expenses as the remainder of the case moves forward." [*Id.*]

A plaintiff who wishes to voluntarily dismiss its action but who cannot do so via notice or stipulation under Rule 41(a)(1) must seek an order of dismissal from the court. FED. R. CIV. P. 41(a)(2). Rule 41(a)(2) authorizes the voluntary dismisal of a cause of action, but only "upon order of the court and upon such terms and conditions as the court deems proper." Fed.R.Civ.P. 41(a)(2). Generally, a dismissal under Rule 41(a)(2) is addressed to the sound discretion of the court and the motion is granted unless the opposing party will suffer legal prejudice. *See Ohlander v. Larson,* 114 F.3d 1531, 1537 (10th Cir.1997); *see also Clark v. Tansy,* 13 F.3d 1407, 1411 (10th Cir.1993). However, Rule 41 "is designed primarily to prevent voluntary dismissals which unfairly affect the other side, and to permit the imposition of curative conditions." *Phillips USA, Inc. v. Allflex USA, Inc.,* 77 F.3d 354, 357 (10th Cir.1996). The Tenth Circuit has identified four non-exclusive factors that should be considered when reviewing a request for voluntary dismissal: "the opposing party's effort and expense in preparing for trial; excessive delay and lack of diligence on the part of the movant; insufficient explanation of the need for dismissal; and the present stage of the litigation." *County of Santa Fe, New Mexico v. Public Service Co. of New Mexico,* 311 F.3d 1031, 1048 (10th Cir.2002).

The Court first considers Webco's Motion for Order of Voluntary Dismissal for Counts II and III. Webco filed this motion on November 6, 2012, after the close of discovery and the deadline for dispositive motions. In its motion, Webco explains that it seeks dismissal "to streamline the litigation and reduce costs and expenses as the remainder of the case moves forward." [Doc. No. 86, ¶ 3]. The Court finds Webco's explanation for its need to dismiss at this late stage in the litigation is insufficient to justify the excessive delay in seeking dismissal.

Moreover, Webco's delay in filing its motion caused Defendants to expend substantial effort and expense in preparation for trial. The Court recognizes that Defendants' discovery, motion practice, and pretrial preparation have been significant. The circumstances of this case make it clear that Defendants would be prejudiced if Webco's motion was granted without prejudice.

The Court is also wary of allowing Webco to dismiss its claims in light of Defendants' June 15, 2012 Offer of Judgment pursuant to Federal Rule of Civil Procedure 68. Rule 68 is designed to encourage settlement as it allows a defendant to make a firm offer of judgment and shifts the costs of litigation onto plaintiff if plaintiff rejects the offer and is then awarded less than the Rule 68 offer. *Marek v. Estate of Chesny,* 473 U.S. 1, 5 (1985). If Webco were allowed to dismiss its claims without prejudice, then Defendants would be unfairly deprived of the benefits conferred upon them by Rule 68. To be sure, the Court finds that Webco has no reasonable explanation for the delay in filing its motion to dismiss, and the timing of events suggests that Webco is seeking to dismiss its claims to avoid a ruling on Defendants' motion for summary judgment. Therefore, the Court will impose curative conditions on Webco's motion to dismiss.

In order to prevent this voluntary dismissal from unfairly affecting Defendants, the Court has broad discretion to impose curative conditions, including, but not limited to, dismissal with prejudice and requiring plaintiff to compensate the defendants for costs and attorney's fees. *Phillips USA,* 77 F.3d at 357; *See Gravatt v. Columbia University,* 845 F.2d 54, 55 (2d Cir. 1988); *Andes v. Versant Corp.,* 788 F.2d 1033, 1037 (4th Cir. 1986); *Bridgeport Music, Inc. v. Universal-MCA Music Pub., Inc.,* 583 F.3d 948, 950 (6th Cir. 2009); *United States v. One Tract of Real Property,* 95 F.3d 422, 425 (6th Cir. 1996); *Marlow v. Winston & Strawn,* 19 F.3d 300,

304 (7th Cir. 1994); *Jaramillo v. Burkhart,* 59 F.3d 78, 79 (8th Cir. 1995).[1] Accordingly, the Court grants Webco's Motion for Order of Voluntary Dismissal [Doc. No. 86] upon the following conditions: (1) that the claims be dismissed with prejudice; and (2) that Webco is ordered to pay Defendants' reasonable attorneys' fees incurred in defense of Count II and Count III from June 15, 2012, forward. The Court, however, recognizes that Plaintiff is not bound to accept this condition, but may withdraw its Motion and proceed to a decision on the merits. *See Michigan Surgery Inv., LLC v. Arman*, 627 F.3d 572, 576 (6th Cir. 2010); *Gravatt v. Columbia University*, 845 F.2d 54, 56 (2d Cir. 1988). Thus, Webco is granted five days from the date of this Opinion to withdraw its Motion.

With regard to Webco's Motion for Order of Voluntary Dismissal for Counts VII and VIII, the Court notes that the motion was filed before the deadline for dispositive motions and prior to the close of discovery. Although the Court believes Webco's explanation is lacking in persuasiveness, the other factors weigh in favor of granting Webco's motion without prejudice. Accordingly, Webco's Opposed Motion for Order of Voluntary Dismissal for Counts VII and VIII [Doc. No. 44] is granted without prejudice.

**B. Motion for Summary Judgment**

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In making the summary judgment determination, the Court examines the

---

[1] The Tenth Circuit has indicated its agreement with the framework articulated by other circuits regarding a court dismissing a complaint with prejudice after the plaintiff has moved to dismiss without prejudice. *See Rockwell Int'l,* 282 F.3d 787, 810 (10th Cir. 2002) ("We are impressed by these factors and opinions, with which we do not disagree.").

factual record and draws reasonable inferences therefrom in the light most favorable to the non-moving party. *Simms v. Oklahoma*, 165 F.3d 1321, 1326 (10th Cir. 1999). The presence of a genuine issue of material fact defeats the motion. An issue is "genuine" if the evidence is significantly probative or more than merely colorable such that a jury could reasonably return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if proof thereof might affect the outcome of the lawsuit as assessed from the controlling substantive law. *Id.* at 249.

### 1. Webco's Breach of Contract Claim

The parties filed cross-motions for summary judgment on the breach of contract claims asserted by Webco against Defendants. "To establish a breach of contract claim under Oklahoma law, a plaintiff must show: (1) formation of a contract; (2) breach of the contract; and (3) damages as a direct result of the breach." *Tabernacle v. Church Mut. Ins. Co., Inc.*, 2012 WL 4128291 (W.D. Okla. Sept. 18, 2012) (citing *Digital Design Group, Inc. v. Info. Builders, Inc.*, 24 P.3d 834, 843 (Okla. 2001)).

#### a. Breach of the Contract

Webco's primary contention is that Defendants breached the Services Agreement by providing technical development services to Coastal in violation of Section Four and soliciting Webco employees in violation of Section Eight. If the terms of the contract are "unambiguous, clear and consistent, they are to be accepted in their ordinary sense and enforced to carry out the expressed intention of the parties." *Roads West, Inc. v. Austin*, 91 P.3d 81, 88 (Okla. Civ. App. 2004). The interpretation of an unambiguous contract is a question of law for the courts. *Ferrell Const. Co., Inc. v. Russell Creek Coal Co.*, 645 P.2d 1005, 1007 (Okla. 1982). After carefully

reviewing the relevant provisions of the Agreement, the Court is convinced that the parties' intentions are clearly and unambiguously expressed in the contractual language.

Section Four of the Services Agreement states: "During Agreement Term, Accurate NDT will not provide *Technical Development Services* to other seam welded umbilical tube makers, including 19D umbilical tube products." (emphasis added). Technical Development Services is defined in Section Two of the Services Agreement as follows:

> During Agreement Term, Accurate NDT will assist Webco in the development of welded seam super duplex umbilical tubing. The scope of this involvement is mainly in the area of nondestructive testing – ultrasonic, eddy current and radiographical inspection, however it may cover other areas of the manufacturing process and/or equipments as directed or needed ('Technical Development Services' or 'Services').

The plain language of these two provisions make it clear that Defendants' actions did not constitute a breach of contract.

While it is possible to interpret Technical Development Services to encompass a wide range of highly technical activities, the Court finds Defendants' actions were not technical in nature. There is no genuine dispute that Coastal was simply a newly organized corporate entity in the early stages of seeking investors and developing a business plan. Coastal had not progressed past the planning stages and did not have an established umbilical tube manufacturing process necessitating any technical development services. Accordingly, the Court finds that Defendants did not breach Section Four of the Services Agreement.

Webco also asserts that Defendants breached Section Eight of the Services Agreement by soliciting Webco employees. Webco's Non-Solicitation Policy prohibits solicitation by or of employees during working hours except during break periods, meal times, or other periods during the work day when employees are properly not engaged in performing their work tasks. It also prohibits non-employees from certain solicitations on Webco property. The Court has

doubts as to whether the parties intended to be bound by this provision at the time the Services Agreement was formed; nevertheless, even if it was the parties' intent that Diamonds' conduct be governed by the Non-Solicitation Policy, the Court does not believe Diamonds' conduct violated this provision.

In support of its contention that the Non-Solicitation Policy was breached, Webco points to conversations Diamond had with two Webco employees, Pallagar and Epperly, regarding Coastal. However, Webco can produce no facts indicating that Diamond discussed Coastal with Pallager under the prohibited conditions. In addition, with regard to Epperly, it is undisputed that Diamond contacted Epperly at his home to discuss the details of Coastal. Webco fails to demonstrate that Defendants breached Section Eight of the Services Agreement. Accordingly, the Court finds that Defendants did not breach the Services Agreement.

### b. Damages

Even if Webco could demonstrate that a breach of contract occurred, Webco's claim also fails because it cannot demonstrate that it was damaged by an alleged breach of contract. "Damages claimed for a breach of contract cannot be recovered unless they are clearly ascertainable, both in their nature and origin, and it must be made to appear that they are the natural and proximate consequence of the breach of the contract and not speculative and contingent." *Fowler v. Lincoln County Conservation District,* 15 P.3d 502, 507 (Okla. 2000) (citation omitted). To determine if damage is the natural and proximate consequence of a breach of contract, Oklahoma courts follow the general rule of foreseeability first announced in *Hadley v. Baxendale*, 9 Exch. 341, 156 Eng. Reprint 145 (1854). *See Coker v. Southwestern Bell Tel. Co.*, 580 P.2d 151, 153 (Okla. 1978); *Missouri P.R.R. v. Ridley*, 383 P.2d 227, 229 (Okla. 1963)

(following *Hadley*). This rule is summarized in Restatement (Second) of Contracts § 351 Comment A (1970) as follows:

> A contracting party is generally expected to take account of those risks that are foreseeable at the time he makes the contract. He is not, however, liable in the event of breach for loss that he did not at the time of contracting have reason to foresee as a probable result of such a breach. The mere circumstance that some loss was foreseeable, or even that some loss of the same general kind was foreseeable, will not suffice if the loss that actually occurred was not foreseeable. It is enough, however, that the loss was foreseeable as a probable, as distinguished from a necessary, result of his breach.

"Moreover, under Oklahoma law, the amount awarded for breach of contract 'must be ascertainable in some manner other than by mere speculation, conjecture or surmise, and by reference to some definite standard.'" *Old West Annuity and Life Ins. Co. v. Progressive Closing & Escrows, Inc.,* 74 F. App'x 4, 8 (10th Cir.2003) (unpublished opinion) (quoting *John A. Henry & Co., Ltd. v. T.G. & Y. Stores Co.,* 941 F.2d 1068, 1071 (10th Cir.1991)).

Webco argues that it suffered damages as a result of Defendants' breach of contract. Specifically, Webco asserts that it was forced to replace Pallegar and two other employees because those employees had a conflict of interest arising from their association with Diamond and Coastal. During his deposition, Webco's Chief Operating Officer, David Boyer, testified that as a result of terminating these employees, Webco was forced to transfer an employee from its Pennsylvania division to another facility and pay $8000 in relocation expenses. Consequently, this transfer left a vacancy in Pennsylvania that had to be filled by hiring two additional employees. Boyer estimated that the cost of hiring and training these new employees was $112,500, because, in his opinion, these employees were unable to make a contribution as employees for the first six months of their employment.

There is no doubt that Accurate's actions set in motion a sequence of events which ultimately led to Webco's damages. The relevant inquire, however, is whether the damages were

foreseeable at the time of contracting, and were proximately caused by the breach of contract. Although the principles of legal causation sometimes receive labels in contract analysis different from the "proximate causation" label most frequently employed in tort analysis, these principles nevertheless exist to restrict liability in contract as well. Indeed, the requirement of foreseeability may be more stringent in the context of contract liability than it is in the context of tort liability. Restatement (Second) of Contracts § 351 and Comment a, pp. 135-136 (1979); 11 W. Jaeger, Williston on Contracts § 1344, pp. 227-228 (3d ed.1968); 5 A. Corbin, Corbin on Contracts § 1008, pp. 75-76 (1964); id., § 1019, at 113-116; 3 E. Farnsworth, Contracts § 12.14, pp. 241-243 (1990) ("*Hadley* 'impose[s] a more severe limitation on the recovery of damages for breach of contract than that applicable to actions in tort or for breach of warranty, in which substantial or proximate cause is the test.'" (internal citations omitted)). Oklahoma recognizes that proximate cause may be defeated by an intervening cause that breaks the causal chain between the party at fault and the plaintiff's harm. *Brigance v. Velvet Dove Restaurant*, 756 P.2d 1232 (Okla. 1988); *Thompson v. Presbyterian Hosp., Inc.*, 652 P.2d 260, 264 (Okla. 1982); *see also Graham v. Keuchel*, 847 P.2d 342 (Okla. 1993); Oklahoma Uniform Jury Instructions–Civil § 9.8 (2005).

After examining the sequence of events, the Court finds that an intervening cause interrupted or severed the connection between Accurate's alleged breach and Webco's injury. Both the terminated employees' decision to interact with Diamond and Coastal in a manner giving rise to a conflict of interest along with Webco's decision to fire the employees were superseding intervening causes of Webco's damages. Further, it is not reasonable to think that either party could foresee that a breach of the Services Contract would result in the type of damage Webco is alleging. In addition, the Court finds damages based on the decreased

productivity of the newly hired employees is highly speculative. For example, it would be difficult to ascertain whether the newly hired employees have experience which makes them more valuable to the company than their predecessors. Accordingly, Defendants are entitled to summary judgment on Webco's breach of contract claim.

### 2. Intentional Interference with Contractual Relations Claim

In order to establish a claim of tortious interference with a contract, Webco must show that: "(1) [it] had a business or contractual right that was interfered with; (2) the interference was malicious and wrongful, and that such interference was neither justified, privileged nor excusable; and (3) damage was proximately sustained as a result of the complained-of interference." *Sw. Stainless, LP v. Sappington*, 582 F.3d 1176, 1188 (10th Cir. 2009) (quoting *Mac Adjustment, Inc. v. Prop. Loss Research Bureau,* 595 P.2d 427, 428 (Okla.1979)) (internal quotations omitted). For the same reasons discussed above, the Court finds that Webco has failed to meet its burden on the damages element of this cause of action. Accordingly, Accurate is entitled to judgment on this claim.

### 3. Injunctive Relief

Webco seeks injunctive relief against Accurate pursuant to the NDNU between the parties. Accurate argues that Webco is not entitled to injunctive relief because the NDNU is void as a violation of public policy. Under Oklahoma law, "[e]very contract by which any one is restrained from exercising a lawful profession, trade or business of any kind, otherwise than as provided by Sections 218 and 219 of this title, or otherwise than as provided by Section 2 of this act, is to that extent void." Okla. Stat. Ann. tit. 15, § 217 (West). Section 217 has been construed by Oklahoma courts to invalidate only unreasonable restraints on trade. *Bd. of Regents of Univ. of Oklahoma v. Nat'l Collegiate Athletic Ass'n,* 561 P.2d 499, 506 (1977); *see also*

*Cooper v. Tanaka*, 591 P.2d 1181 (Okla. App. 1978). "The fundamental test of the reasonableness of a restraint is its effect on the public." *Vanguard Envtl., Inc. v. Curler*, 190 P.3d 1158, 1165 (Okla. App. 2008) (quoting *Board of Regents*, 561 P.2d at 506). Determining the reasonableness of a restraint requires courts to balance "the public's and the individual's need and entitlement to free commerce and the right to earn a livelihood by employment and...the necessity of the restraint to protect and effectuate the basic transaction." *Cooper*, 591 P.2d at 1184. Oklahoma courts have explained that a "restrictive covenant is reasonable if it (1) is no greater than necessary to protect the employer from unfair competition, (2) does not impose an undue hardship on the employee, and (3) is not injurious to the public." *Inergy Propane, LLC v. Lundy*, 219 P.3d 547, 558 (Okla. App. 2009).

The Court finds the NDNU to be an unenforceable restraint on trade. Of particular concern is the NDNU's restriction on the use of technical skills, described in the NDNU as "know-how," for an unlimited duration of time. Our free economy functions in part by encouraging individuals to develop valuable skill-sets, through education, training, and work experience, and market those skill-sets to others. There is no doubt that "one who has worked in a particular field cannot be compelled to erase from his mind all of the general skills, knowledge, acquaintances and overall expertise acquired during his tenure with [a] former employer." *Disher v. Fulgoni*, 464 N.E.2d 639, 642 (Ill. App. 1984). These important concerns necessitate a close examination of the effect of the NDNU on Diamond's ability to utilize the skills he has developed over the course of his life.

Webco asserts that it only seeks to prevent Diamond from utilizing the know-how he obtained directly through his performance of the Services Agreement. Indeed, the NDNU does distinguish between know-how obtained directly from Webco and know-how already known to

Diamond. Under the terms of the NDNU, however, Diamond's previously developed know-how only avoids restriction by the NDNU if he can produce files and records in his possession prior to receipt of the know-how in question indicating it was known to Diamond before Webco disclosed the information to him. To be sure, it would be incredibly difficult for Diamond, or any other person who developed expertise over an extended period of time, to produce tangible evidence documenting his or her progressively increasing skill-set. The practical result of enforcing the NDNU would be to preclude Diamond from using skills he developed through experiences prior to the Services Agreement or developing a competing enterprise. The Court finds the NDNU's practical effect and unlimited duration to be an unreasonable and unenforceable restraint on trade. Additionally, the Court will not engage in judicial modification of the unenforceable provision because the fundamentally flawed nature of the agreement would require "material judicial alteration and the provision of essential terms in order to come within the rule of reason." *See Loewen Group Acquisition Corp. v. Matthews*, 12 P.3d 977, 982 (Okla. App. 2000). Accordingly, Defendants are entitled to summary judgment on the issue of injunctive relief.

### 4. Accurate's Breach of Contract Claim

Accurate asserted a counter-claim against Webco for breach of contract. Accurate seeks payment for inspection services performed pursuant to the Services Agreement. Webco argues that it is relieved from its obligation to perform under the contract because Accurate breached a material term the Services Agreement thereby relieving Webco from its contractual obligation to pay Accurate. As discussed above, the Court finds Accurate did not breach the unambiguous terms of the contract. Even if Webco could demonstrate that a breach occurred, the Court finds

that when the facts are viewed in a light most favorable to Webco, Diamonds alleged actions still do not constitute material breach of the Services Agreement.

Under Oklahoma law, "it is the general rule that a contract must be performed according to the terms of the agreement before a party can have any right of action." *Stoltz, Wagner & Brown v. Cimarron Exploration Co.*, 564 F. Supp. 840, 850 (W.D. Okla. 1981); *Houser v. Sheehan*, 389 P.2d 94, 97 (Okla. 1964). Accurate, as the party seeking recovery "has the burden of showing that the contract was performed according to its terms." *Id.* (citing *Camp v. Black Gold Petroleum Co.,* 154 P.2d 769 (Okla. 1944)). Under well-established common law rules, however, a party is not automatically excused from the future performance of contract obligations simply because the other party commits a breach. *Dollar Rent A Car Sys., Inc. v. P.R.P. Enterprises, Inc.*, 01 CV 698 JHP FHM, 2006 WL 1266515 (N.D. Okla. May 8, 2006) aff'd, 242 F. App'x 584 (10th Cir. 2007) (citing *Owens v. Automotive Engineers, Inc.,* 255 P.2d 240, 247 (Okla. 1953); *Camp,* 154 P.2d at 771; *Messick v. Johnson,* 30 P.2d 176, 178 (Okla. 1934); *Robberson Steel Co. v. Harrell,* 177 F.2d 12, 17 (10th Cir. 1949); 17B C.J.S. Contracts § 503 (1999); *and* Restatement (Second) of Contracts § 237 (1981.)). Thus, if a breach is relatively minor and not of the essence, the plaintiff is still bound by the contract and may not abandon performance. *Id.*

In *Bonner v. Oklahoma Rock Corporation*, the Oklahoma Supreme Court explained that the following factors are helpful to determining whether a failure to render or to offer performance is material:

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
>
> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

(c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

(d) the likelihood that the party failing to perform or offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; [and]

(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

863 P.2d 1176, 1186 n.61 (Okla. 1993) (quoting Restatement (Second) of Contracts § 240)). The factors outlined above reflect the reality that "[t]he standard for determining materiality must necessarily be both imprecise and flexible to further the purpose of securing for each party his or her expectation of an exchange of performances." 23 Williston on Contracts § 63:3 (4th ed.). While courts should consider the factors outlined above, "*the test is whether the failure of performance defeats the object of the contract.*" *Bonner*, 863 P.2d at 1186 (quoting *G.A. Nichols, Inc. v. Hainey*, 122 P.2d 809, 811 (Okla. 1942)) (emphasis original).

Applying the principles outlined above, the Court finds these allegedly violated provisions of the Services Agreement to be independent, incidental covenants. The primary purpose of the contract was to secure the provision of technical development services by Defendants. Defendants provided the bargained-for services to Webco's satisfaction; therefore, even if Defendants' actions constituted a violation of certain provisions contained in the Services Agreement, Webco is still obligated to fulfill its obligations under the contract.

Accordingly, Accurate is entitled to summary judgment on its breach of contract claim.

## CONCLUSION

For the reasons detailed above, Defendants' Motion for Summary Judgment [Doc. No. 56] is **GRANTED** and Webco's Motion for Partial Summary Judgment [Doc. No. 57] is **DENIED**. In addition, Webco's Opposed Motion to Voluntarily Dismiss Counts VII and VIII [Doc. No. 44] is **GRANTED** without prejudice. Webco is granted until December 5, 2012 to

file a motion to withdraw its Opposed Motion to Voluntarily Dismiss Counts II and III [Doc. No. 86].

_____
James H. Payne
United States District Judge
Northern District of Oklahoma